**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COUNSEL CORPORATION,** | ) | |
| **Plaintiff** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | **No. 04-3852** |
| | ) | |
| **GARY J. WASSERSON,** | ) | |
| **Defendant** | ) | |

| | | |
|---|---|---|
| **GARY J. WASSERSON,** | ) | |
| **Plaintiff** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | **No. 04-3864** |
| | ) | |
| **I-LINK CORP., et al.** | ) | |
| **Defendants** | ) | |

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                               **March 31, 2010**

Before the Court are Plaintiff Gary Wasserson's ("Wasserson") Motion to Confirm

Award of the Arbitrator and Defendants I-Link Corp. et al.'s Motion to Vacate, Modify, and/or

Correct the Arbitral Award.

## I.    FACTUAL HISTORY

In 1999, Alan Silber ("Silber"), principal owner of Counsel Corporation and its numerous

affiliates("Counsel Corp."), ventured into the telecommunications industry.[1]  Silber recruited

Gary Wasserson ("Wasserson") to help to launch his telecommunications initiative.[2]  Wasserson

---

[1]        Wasserson's Response to the Consol. Mem. of Points and Auth. in Supp. of Defs.' Mot. to Vacate, Modify and/or Correct Arbitral Award and Opp. to Pl.'s Mot. to Confirm Award [C.A. No. 3864, Document No. 52] at 5.

[2]        Id. at 6.

was promised an equity interest in the telecommunications entities that Silber would establish, as memorialized in an employment offer letter ("Employment Letter") dated January 20, 2000.[3] The Employment Letter provided for a one year commitment and noted the parties' intent to enter into a more detailed, three-year employment agreement at a later date.[4] He was hired to identify and acquire telecommunication companies on behalf of Counsel Corp. On February 1, 2000, Wasserson began working as Counsel Corp.'s Chief Executive Officer at an annual salary of $360,000.

During this same time period, Wasserson sought issuance of his agreed upon equity interest by repeatedly requesting his stock certificates from Silber. Two months into his employment, Wasserson sent an email to Silber complaining about the failure to provide him with his equity in Counsel Corp.[5] Silber assured Wasserson that he was a ten percent (10%) member of Counsel Communications LLC ("CCLLC"), retroactive to the commencement of his employment.[6]

In August 2000, Wasserson was presented with the three-year contract ("2000 Employment Agreement") contemplated in the Employment Letter, which offered Wasserson a

---

[3]     The Employment Letter was signed by Silber and presented on "Counsel Corp." letterhead, but made no distinction between Counsel Corp. (U.S.) and Counsel Corp. (Canada), companies both owned and operated by Silber. See Id., Ex. B; Mot. to Confirm Award of the Arbitrator, Robert B. Davidson, Esquire of JAMS, the Resolution Experts, Ex. A (JAMS Arb. No. 1420014521, Corrected Final Award) at 11.

[4]     Response to Defs.' Consol. Mem. of Points and Auth. in Supp. of Mot. to Vacate at 6.

[5]     Id., Ex. D.

[6]     As of the date of commencement of Wasserson's employment, Silber's telecommunications initiative was operated primarily from the U.S. parent company CCLLC, which temporarily changed its name to "Counsel Springwell" in 2001, and allegedly promised the same 10% interest previously promised to Wasserson to William E. Barker and Mufit Cinali of Springwell Partners. This deal later collapsed. According to Silber, Cinali and Barker simply gave back their equity interest for no consideration and walked away from the venture in 2002. Interim Award at 30.

salary of $600,000, with a potential bonus up to 75% of the base salary ($450,000) to be

determined by the Board of Directors.[7]  Additionally, Wasserson was entitled to 10% of the stock

in a newly created Silber entity, Webtotel.  The 2000 Employment Agreement indicated that this

stock had already been issued to Wasserson.[8]  It was acknowledged, at the Arbitration hearing,

that contrary to the express language in the August 2000 Agreement, no stock certificates were

actually issued to Wasserson; instead Counsel Corp. held all the stock and used it to finance a

later acquisition, unbeknownst to Wasserson.[9]

In March 2001, CCLLC initiated the purchase of I-Link, its first financially significant

telecommunications acquisition.[10]  On April 17, 2001, Webtotel merged with I-Link in a stock-

for-stock transaction - a transaction that was intentionally not disclosed to Wasserson.[11]  Section

2.7 of the I-Link/Webtotel Plan and Merger Agreement gave 17,454,333 shares of I-Link's stock

to Webtotel's shareholders in exchange for their Webtotel shares.  On June 4, 2001, I-Link

acquired certain assets of WorldxChange Corp. ("WorldxChange").[12]  At various times,

Wasserson acted as CEO or Director of CCLLC, WordxChange, I-Link, and Nexbell.[13]

During the summer of 2001, less than one year into his three-year Employment

---

[7]     Id., Ex. F.

[8]     See Defs.' Consol. Mem. of Points and Auth. in Supp. of Mot. to Vacate, Ex. 12 (JAMS Arb. No. 1420014521, Interim Award) at 12, 15.

[9]     See Response to Defs.' Consol. Mem. of Points and Auth. In Supp. of Mot. to Vacate, Ex. I.

[10]     I-Link was, and still is, publically traded, although its business today differs materially from the business that it was in when Counsel Corp. acquired it.  See Corrected Final Award at 57.

[11]     The I-Link stock that was traded for the Webtotel stock was unregistered. See Id. at 58.

[12]     Interim Award at 17.

[13]     Id. at 18.

Agreement, Silber presented Wasserson with another employment contract with modified terms, a lower base salary, and a provision that the initial term of employment would end on December 31, 2003.[14]  Both the 2000 and 2001 Employment Agreements contained arbitration clauses in Paragraph 16, specifying that any Arbitration resulting from a dispute between the parties would occur in New York, under New York law.

In December 2001, Wasserson participated in an Executive Stock Purchase Plan ("ESPP"), paying $141,966 of his own funds, and borrowing $566,670 from Counsel Corp. (U.S.) to fund the rest of the stock purchase, as evidenced by both a Note and a Loan Agreement dated December 21, 2001 between Counsel Corp. (U.S.) and Wasserson.[15]  Paragraph 6 of the Loan Agreement required an interest rate of 10% per annum commencing on the day after the loan becomes due and payable.

Wasserson's professional relationships with others in the telecommunications industry led to the acquisition of patents owned by Acceris Communications Inc. ("Acceris").  However, on the day after the patents were secured, Silber advised Wasserson that his employment contract would not be renewed.[16]  Silber sent Wasserson a Notice of Non-Renewal under paragraph 2(a) of the 2001 Employment Agreement, which called for Wasserson's employment to end on

---

[14]     Wasserson's base salary dropped from the $600,000 set forth in the 2000 Employment Agreement to $550,000 through Jun 30, 2003 and the new contract provided that during the last six month period, Wasserson's base pay would be reduced 50% to an annual rate of $275,000; in contrast, the August 2000 Agreement had no reduction to the base pay.  Response to Defs.' Consol. Mem. of Points and Auth. In Supp. of Mot. to Vacate, Ex. N; Interim Award at 26.

[15]     Interim Award at 45-46, 53.

[16]     Webtotel and Acceris are effectively the same.  Webtotel was merged into I-Link in April 2001 and in May 2003 I-Link changed its name to Acceris.  As a technical matter, Webtotel may have survived as an independent shell subsidiary, but under all of the facts, Acceris is the corporate successor to Webtotel.  Today, Acceris is known as C2 Global Technologies.  See Corrected Final Award at 56; see also, Interim Award at 51.

December 31, 2003.[17]  As rationale for terminating Wasserson's employment, Silber referenced Wasserson's failure to advise him of developments in a federal criminal action for environmental violations allegedly committed by a defunct dry-cleaning company owned by Wasserson.[18]

Upon his termination on December 31, 2003, Wasserson raised issues with Counsel Corp. regarding their alleged failure to pay him in accordance with the contract, to include payment of unused vacation time as well as his 10% stock interest.  Disputes about accumulated vacation pay and expense reimbursements that the company allegedly owed Wasserson were left largely unresolved.  It was not until April 2008 that Wasserson learned for the first time that Counsel Corp. claimed to be a 100% owner of CCLLC.

## II.    PROCEDURAL HISTORY

On August 13, 2004, Counsel Corp. and Wasserson simultaneously filed the two related underlying actions.[19]  Wasserson's Complaint alleged breach of contract, detrimental reliance, fraud and violation of the Pennsylvania Wage Payment and Collection Law, seeking back pay, vacation pay, and compensation of unpaid bonuses and company stock; Counsel Corp.'s Complaint alleged breach of contract and unjust enrichment, seeking repayment of the $566,670 loan that Counsel made to Wasserson to enable his participation in the company's 2001 ESPP.[20]

---

[17]    Interim Award at 30; Mem. of Law in Supp. of Defs.' Mot. to Dismiss, Ex. 6 at 11.

[18]    Mem. of Law in Supp. of Defs.' Mot. to Dismiss, Ex. 6 at 13.

[19]    Counsel Corp.'s ligation named Wasserson as the sole defendant in a lawsuit filed in the District of New Jersey, which was transferred to this District and docketed as Civil Action No. 04-3852; Wasserson named I-Link Corp. (formerly Webtotel, Inc.), Counsel Springwell Communications, LLC, Counsel Corp., and Counsel Communications, Inc. as the four defendants in Civil Action No. 04-3864.  On November 2, 2004, Civil Action No. 04-3864 was reassigned to this Court from the Hon. Anita B. Brody as a related action to Civil Action No. 04-3852. See C.A. No. 04-3864, Document No. 11.  Unless otherwise noted, the Docket Entry citations contained herein are identical in both civil actions.

[20]    C.A. 04-3852, Compl. [Document No. 1] at 1, 3-4; C.A. No. 04-3864, Compl. at 3, 10-17.

On September 7, 2004, Defendants I-Link Corp. et al. ("Defendants") filed a motion to dismiss Wasserson's Complaint and a memorandum of law in support of its motion to compel arbitration.[21] In their supporting memorandum of law, Defendants argued that "it is undeniable that the parties have expressly agreed in writing to arbitrate their disputes arising under or in connection with the Employment Agreements between them [and] [t]he [Federal Arbitration Act] ("FAA") unquestionably controls the contracts at issue...[thus] all of plaintiff's claims arise under or in connection with the employment agreement and so should be ordered to arbitration...all of plaintiff's claims are subject to mandatory binding arbitration."[22] In addition to Wasserson's opposition to Defendants' motion to dismiss, Wasserson filed a motion to dismiss Counsel Corp.'s Complaint on September 21, 2004.[23]

On January 14, 2005, after a hearing on the parties' respective motions to dismiss, the Court denied Wasserson's motion; granted Defendants' motion to dismiss in part; stayed both actions pending arbitration; and placed the matters in civil suspense.[24] Over the course of the next three and a half years, the Court tracked the status of the two actions through ordered joint status reports filed by the parties. On March 15, 2005, by Demand for Arbitration, Wasserson initiated an arbitration with JAMS Resolution Experts, naming five respondents: I-Link Corp. ("I-Link"); Springwell Communications, LLC ("Springwell"); Counsel Corp.; Counsel

---

[21]   C.A. No. 04-3864, Document No. 2.

[22]   Mem. of Law in Supp. of Defs.' Mot. to Dismiss, or in the Alternative, to Stay the Compl. and Enforce the Parties' Mandatory Arb. Agreement, or in the Alternative, to Dismiss the Compl. Against Def. Allan Silber for Ineffective Service of Process, to Dismiss the Compl. Against Def. Counsel Communications for Failure to State a Claim Upon Which Relief Can Be Granted, and Strike Portions of the Compl. as Immaterial, Impertinent and Scandalous [C.A. No. 04-3864, Document Entry No. 2-1] at 8-9, 17.

[23]   C.A. No. 04-3852, Document No. 3; C.A. No. 04-3864, Document No. 3.

[24]   C.A. No. 04-3852, Document No. 14; C.A. No. 04-3864, Document No. 15.

Communications, Inc. ("CCI"); and Silber.[25]

On September 16, 2005, the Arbitrator heard oral argument on several motions submitted by the parties.[26]  By Interim Award dated October 12, 2005, the Arbitrator determined that he had jurisdiction to hear Wasserson's claims against certain non-signatories to the employment agreements at issue, granted Wasserson's motion to amend his Arbitration Demand to assert claims against Counsel Corp. (Canada), and denied respondents' motion to dismiss all claims and parties, except as to Counsel Communications, Inc. ("CCI").[27]  On November 10, 2008, a five-day hearing commenced in New York City, wherein six witnesses testified.[28]  After the hearing, the parties filed post-hearing briefs and reply briefs.[29]

On April 24, 2009, the Arbitrator issued a fifty-five page Interim Award, finding, in pertinent part, that:

> Wasserson, as a 10% shareholder of Webtotel, was entitled to receive

---

[25]     During the Arbitration, the parties were designated as Claimant and Respondents, Wasserson being designated as the Claimant.

[26]     Upon agreement by the parties, JAMS Arbitrator, Robert B. Davidson, presided over all of the Arbitration proceedings.

[27]     CCI was a subsidiary used by Counsel Corp. (Canada) to hold its telecommunications business. CCI was never party to an agreement with Wasserson.  As such, the Arbitrator dismissed CCI from the Arbitration. In light of the Arbitrator's decision on the parties' pre-arbitration motions, a procedural order dated October 12, 2005 directed that the caption of the case be changed to reflect the current names of the remaining parties, set a revised schedule for limited discovery, and scheduled the arbitration hearing.  See Interim Award at 6-7.  The Arbitrator's decision to dismiss CCI from the Arbitration did not modify the caption of this Court in C.A. No. 04-3864, wherein CCI remains a named Defendant.   See C.A. No. 04-3864.

        After the October 2005 Interim Award, the matter was placed in suspense for approximately three years due, in part, to the parties' failure to remit fees due to JAMS in accordance with JAMS Rule 6(c), which provides that "if, at any time, any Party has failed to pay fees or expenses in full, JAMS may order the suspension or termination of the proceedings..."  See Interim Award at 7.

[28]     Corrected Final Award at 7.  The Arbitrator established exhaustive facts pertinent to the Award based upon evidence presented and the credibility of the witnesses presented at the five-day hearing.

[29]     Id. at 8.

> 1,745,433 shares of I-Link stock on the date of exchange pursuant to the [I-Link/Webtotel] Merger Agreement....
>
> Wasserson owes Counsel [Corp.] (U.S.) $566,670 pursuant to the terms of the Loan Agreement less a credit for the proceeds of the repurchase of the [10% of] stock [which] should have occurred 30 days after Wasserson's termination, or on or about February 1, 2004....Thus by the terms of the Loan Agreement, Wasserson owes Counsel [Corp.] (U.S.) $191,670 ($566,670 less $375,000) as of February 1, 2004...plus simple interest at the rate of 10% accruing from February 1, 2004 until the date of payment.
>
> Respondents, jointly and severally, are liable to [Wasserson] in the amount of $29,176 representing the underpayment of Wasserson's base salary for the period of April 1, 2001 through October 31, 2001.[30]

The Arbitrator was unable to establish damages specific to Wasserson's inability to sell the I-Link stock that he should have received in the I-Link/Webtotel merger, and therefore reopened the arbitration record for the limited purpose of receiving additional evidence on the valuation of the I-Link stock during the period of April 17, 2001 through December 31, 2003.[31] In May 2009 and June 2009, in accordance with the procedural order that accompanied the Interim Award, the parties filed supplemental memoranda, replies, and expert reports to address the stock valuation issue.[32] The arbitration record was thereafter closed.

On June 29, 2009, a Final Award was issued to the parties. On July 2, 2009, Wasserson moved to correct the Award to provide that the respondents would pay for the costs of the arbitration. The Arbitrator agreed that the original Award incorrectly stated that the costs of the arbitration would be shared, and issued a corrected Final Award.

On July 10, 2009, the Arbitrator issued a sixty-two page Corrected Final Award, finding

---

[30]    Interim Award at 51-52, 55.

[31]    Id. at 52, 54-55.

[32]    Corrected Final Award at 8.

and concluding, in pertinent part, that:

[T]he 2000 Employment Agreement which gave Wasserson 10% of Webtotel, was in effect on April 17, 2001 and...unambiguously left Wasserson with 10% of Webtotel as of the date of the Webtotel/I-Link merger....

Webtotel, however, failed to cause I-Link to deliver that stock, and by doing so, breached its contract with Wasserson....[this failure] also breached Webtotel's implied covenant of good faith and fair dealing, which required Webtotel to enable Wasserson to gain the benefit of his stock ownership (or conversely, not to deprive Wasserson of the benefit of his contract)....

Respondents may not enforce Paragraph 19 of the 2001 Employment Agreement to divest Wasserson of the I-Link stock that should have been delivered to him in April 2001....

Wasserson could not waive his right to the I-Link stock in Paragraph 19 of the 2001 Employment Agreement because he did not even know that he directly owned any I-Link stock. Moreover, Silber knew that Wasserson was ignorant of the true facts....[I]t strains credulity that Wasserson would voluntarily give up almost $1 million in I-Link stock by signing the 2001 Employment Agreement just for the chance to...work for Counsel [Corp.] at a reduced salary....

Wasserson, as a subjective matter, did not know the terms of the I-Link/Webtotel merger and that, by virtue of the Merger Agreement, he was the owner of 1,745,433 shares of I-Link....

I find that neither Silber, nor any of the lawyers working for the Counsel [Corp.] group, adequately disclosed to Wasserson or his counsel the Webtotel/I-Link merger terms prior to presenting the 2001 Employment Agreement (and its Paragraph 19) to Wasserson for signature. Instead, the corporate line was that 'Webtotel was a shell [company].' I also find that Wasserson did not know the true facts and that Silber was aware of his ignorance.

Under the circumstances, Silber and/or the company, had a duty to disclose the actual situation to Wasserson or his lawyer if they wanted a knowing waiver from Wasserson....[I find that] Wasserson reasonably relied on the incomplete statement that Webtotel was a mere shell [company]....

****

[T]he fact that Paragraph 19 of the Employment Agreement may not be enforced against Wasserson, is not fatal to the enforceability of the remainder of the agreement [due to the severability clause in Paragraph 14]. Wasserson knew that he was being effectively demoted. He was fully aware that he would be earning a lesser

salary and, notwithstanding that, voluntarily entered into the new employment agreement. He thereafter worked under that contract for two and a half years and accepted benefits under it. He is, therefore, bound to all of the other terms of that contract other than Paragraph 19.

Wasserson's other defenses to the enforceability of the 2001 Employment Agreement based on duress and a lack of consideration fail as a matter of law....

****

I deny Wasserson's claim for additional vacation pay. Wasserson has not demonstrated an entitlement to more than the 4 or 4 ½ weeks that he did receive....

****

[As to Wasserson's claim for additional salary],Wasserson was incorrectly paid at the lower rate ($550,000/year) rather than at the correct rate ($600,000/year) for seven months, i.e. from April 1, 2001 through October 31, 2001. Thus Webtotel owes Wasserson and [sic] additional $29,167 ($50,000 divided by 12 times 7 months)....

I find that Wasserson was underpaid $29,167 under his 2000 Employment Agreement and otherwise deny his other claims for additional benefits or compensation....

****

[As to the loan agreement, Wasserson] cannot disclaim his obligation [to repay the loan] after the stock price fell....

****

I find that Silber ran the Counsel [Corp] group of telecommunications companies as a unit effectively utilizing various corporate forms for the benefit of himself or of Counsel [Corp.] Canada [the public company he owned and where he gained most of his compensation]....Silber's decision to use Counsel [Corp.] (U.S.) as the corporate party to the 2001 Employment Agreement; his decision to consider Wasserson the owner of 10% of CCLLC (for a while), rather than as a shareholder of Webtotel; his intricate use of corporate vehicles to accomplish his financial objectives, for example his agreement to give Wasserson's [10%] interest to the Counsel [Corp.]-Springwell principals without consulting Wasserson; his instruction to the CFO of Counsel [Corp.] (Canada) to erase Wasserson's equity interest then listed with CCLLC, all evidenced his complete domination and control over the actions of the group. In so controlling the businesses, Silber acted not only on his own behalf but also as the agent for Counsel [Corp.] (Canada)....

These facts lead to the conclusion that both Silber and Counsel [Corp.] (Canada), on an agency, alter-ego or piercing the veil theory, are all liable to Wasserson for the award in this arbitration....

It was Silber who negotiated with Wasserson in the context of Wasserson' switch in employment agreements in late October 2001, and it was he who failed to disclose the material fact that Wasserson was already the owner of a considerable amount of I-Link stock. This personal participation in the events that deceived Wasserson leads to personal liability for Silber.

Because the record was incomplete on the issue of the valuation of I-Link shares, the arbitrator...received further briefing and two expert opinions from the parties on [this] issue....

Wasserson could not have sold his I-Link stock until May 20, 2002, at the earliest...because of a company-imposed blackout period that required executives who wanted to sell their stock to forego any sales for a certain number of days prior to the end of each fiscal period...

I find it highly unlikely...that Wasserson would have sold his I-Link stock while still in Counsel [Corp.'s] employ. He was working for the group, and indeed, was I-Link's CEO from May of 2001. He would most likely have remained a team player and retained the stock hoping for a payday if and when the company succeeded in its core business.

I find it most likely that Wasserson would have sought to divest himself of the I-Link stock after his termination from the company in December of 2003. On December 3, 2003, [when] Wasserson was informed that he would not be receiving a renewal contract, I-Link closed at 19 cents per share....The value of his 1,745,433 I-Link shares on that date, would therefore have been $331,632.27. Wasserson will be awarded that sum with interest from December 3, 2003....[T]he arbitrator deems a price of 19 cents per share to be reasonable....

**** 

Wasserson also seeks punitive damages and costs [however] the arbitrator does not deem this to be a case that warrants the imposition of punitive damages and none are awarded.

While both parties prevailed on some of their claims and some of their defenses, Wasserson, under all the facts and circumstances, must be deemed to be the prevailing party. Accordingly, the Respondents will be assessed the costs of the arbitration including all JAMS administration fees and fees for the arbitrator [in accordance with Paragraph 20 of both the 2000 and 2001 Employment Agreements]. In addition Wasserson will be awarded $75,000 towards attorney's fees, costs, and expenses.[33]

---

[33]     Corrected Final Award at 16, 37-40, 45, 47, 50, 55-59, 61.

On July 16, 2009, in response to the Court's July 15, 2009 order for a joint status report, Wasserson filed the instant Motion to Confirm Arbitration Award.[34]  On July 30, 2009, Defendants subsequently filed their Motion to Vacate, Modify, and/or Correct the Arbitral Award.[35]  The Court has carefully reviewed Wasserson's Motion to Confirm Award of the Arbitrator, Robert B. Davidson, Esquire of JAMS, the Resolution Experts; Defendants' Opposition to Wasserson's Motion to Confirm Award[36]; Defendants' Motion to Vacate, Modify, and/or Correct Arbitral Award; Defendants' Consolidated Memorandum of Points and Authorities in Support of Defendants' Motion to Vacate, Modify, and/or Correct Arbitral award and Opposition to Plaintiff's Motion to Confirm Award[37]; Wasserson's Response to the Consolidated Memorandum of Points and Authorities in Support of Defendants' Motion to Vacate, Modify, and/or Correct Arbitral award and Opposition to Plaintiff's Motion to Confirm Award[38]; Defendants' Reply in Further Support to Vacate, Modify and/or Correct Arbitral Award[39], and all accompanying materials, and this matter is now ready for disposition.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs judicial review of arbitration proceedings.[40]

---

[34]    Document No. 44.

[35]    Document No. 46.

[36]    Document No. 45.

[37]    Document No. 47.

[38]    C.A. No. 04-3864, Document No. 52.

[39]    C.A. No. 04-3852, Document No. 52; C.A. No. 04-3864, Document No. 57.

[40]    9 U.S.C. § 2 (2002).

Judicial review of an arbitrator's award is typically very limited.[41]  The reviewing court is bound by the arbitrator's factual findings, and shall conduct its limited review using the same substantive law that governed the arbitration proceeding.[42]

Courts, however, are "neither entitled nor encouraged to simply 'rubber stamp' the interpretations and decisions of arbitrators."[43]  Pursuant to § 10(a) of the FAA, a court is authorized to vacate an arbitration award only where: there is "evident partiality or corruption in the arbitrator"; "the arbitrator was guilty of misconduct...in refusing to hear evidence pertinent to material in controversy"; or "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."[44]  In addition to the statutory mechanisms for setting aside an arbitral award, a judicially created standard exists that permits a court to vacate an arbitral award when the arbitrator manifestly disregards the law.[45]  An arbitration award may be affirmed even where the arbitrator committed a harmless error of law or fact.[46]  The party seeking to overturn the arbitral award bears the burden of demonstrating that the arbitrator intentionally defied the law.[47]

---

[41]     See Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001).

[42]     See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503 (3d. Cir. 1994); see also Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993).

[43]     Matteson v. Ryder Sys. Inc., 99 F.3d 108, 113 (3d Cir. 1996)(citation omitted).

[44]     9 U.S.C. § 10(a) (2002).

[45]     Local 863 Int'l  Bhd. of Teamsters Warehousemen and Helpers of Am. v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 533 (3d. Cir. 1985); Metromedia Energy, Inc. v. Enserch Energy Serv., Inc., 409 F.3d 574, 579 (3d Cir. 2005).

[46]     See GMS Group, LLC v. Benderson, 326 F.3d 75, 78 (2d Cir. 2003); Metromedia Energy, Inc., 409 F.3d at 578.

[47]     Franko v. Amerprise Financial Serv., Inc., 2009 WL 1636054, at *3 (E.D. Pa. June 11, 2009).

## III. DISCUSSION

### A. Arbitration Award

As noted supra, the parties selected New York as the governing law for arbitration of any disputes arising under the Employment Agreements. It is undisputed that the Arbitrator applied New York law in its analysis. Defendants, however, contest the Arbitrator's legal interpretation of New York contract law as related to the parties' disputes. Defendants ask the Court to vacate the Award "with respect to the Arbitrator's findings that [Wasserson] was entitled to the value of 10% of the I-Link shares issued as part of the I-Link/Nexbell merger consideration"; "vacate or remand to the Arbitrator the determination of which party is the 'prevailing party'"; and to the extent their Motion is denied, "properly calculate the amount of the Award."[48] Wasserson, on the other hand, asks the Court confirm the Corrected Final Award pursuant to 9 U.S.C. § 9, in the amount of $407,580.63.

#### *(i) Arbitrator's Scope of Power.*

Defendants argue that the Arbitrator exceeded his authority by awarding Plaintiff 10% of the I-Link shares issued as part of the I-Link/Nexbell Merger Agreement because "[t]he parties never had agreed to arbitrate a dispute over Plaintiff's claim...to a portion of [consideration from the I-Link/Nexbell merger and] Plaintiff never raised such a claim until after the Arbitration hearing [concluded]."[49] Defendants further assert that "[t]he Arbitrator mistakenly confused Plaintiff's claim to 10% of the platform company (either Corporate Counsel or Webtotel) with Plaintiff's 'post-hearing' claim to 10% of I-Link shares issued as part of the I-Link/Nexbell

---

[48] Defs.' Consol. Mem. of Points and Auth. in Supp. of Mot. to Vacate at 15.

[49] Reply in Further Supp. of Defs.' Mot. at 2.

14

merger."[50]

　　　To support its position, Defendants rely upon <u>Matteson</u>, where the Third Circuit vacated an arbitrator's award based on a finding that the arbitration record contained only "isolated statements and documents" concerning an issue that was later disputed as not being an issue presented to the arbitrator by the parties.[51]　The facts here, however, are easily distinguishable. Unlike the facts in <u>Matteson</u>, the parties here agreed to arbitrate the issue when they entered into the relevant employment agreements in 2000 and 2001, e.g., the contractual provisions granting Wasserson 10% of the company stock was part of the 2000 Employment Agreement and included an arbitration clause.　The scope of an arbitrator's authority is determined by both the terms of the arbitration agreement and "by the scope of the issues submitted by the parties."[52] The Arbitration record is replete with documents and testimony presented at the five-day hearing that overwhelmingly reflect the fact that Wasserson was always focused on the value of the I-Link stock and his 10% interest.　Wasserson's claim to Webtotel, albeit via a claimed ownership of 10% of CCLLC, was always at issue from the time Wasserson filed his Complaint with the Court, as evidenced by the allegations pled in the Complaint.[53]　Despite Defendants' arguments to the contrary, the facts of this case do not support an assertion that the Arbitrator "picked a few isolated statements" out of the arbitration record to make his findings and Award.　The Arbitrator did not exceed his authority in addressing this issue.

---

[50]　　　<u>Id.</u> at 6.

[51]　　　<u>Matteson</u>, 99 F.3d at 114-115.

[52]　　　9 U.S.C. § 10(a)(4); <u>Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs</u>, 357 F.3d 272, 279 (3d Cir. 2004).

[53]　　　<u>See</u> C.A. No. 04-3864, Compl. at 1-2.

*(ii)      Adequate Opportunity to Defend.*

Defendants argue in the alternative that "[e]ven if Wasserson's claim to some of the I-Link shares issued as part of the I-Link/Nexbell merger were deemed arbitrable, [they] were never given notice and a fair opportunity to defend such a claim." Plaintiff counters that Defendants consented to arbitrate all matters relating to his employment agreement, including his dispute concerning the stock shares; therefore Defendants should not have been surprised by Plaintiff's claim to 10% of Webtotel.

A district court may vacate an award if a party to an arbitration proceeding has not been given notice and opportunity to present arguments and evidence on the merits of the dispute.[54] That, however, is not the case here.  Defendants' admit that they, in fact, "were not surprised by [Wasserson's] claim to 10% of Webtotel shares" as "[Wasserson had] always claimed a continuing 10% interest in...either Counsel Communications LLC or Webtotel."[55]  In Defendants' motion to compel arbitration filed with the Court early in these proceedings, Defendants represented to the Court that every claim and defense made by Wasserson in these two lawsuits were subject to arbitration.[56]  Defendants cannot now argue that Wasserson's claims were not arbitrable simply because Defendants were found liable by the Arbitrator.  Ultimately, the issue is one of prejudice, and the Court finds that the record simply does not support Defendants' contention that they were surprised or prejudiced by Wasserson's claim.

Wasserson's failure to articulate his theory of recovery as 10% of the I-Link stock, rather

---

[54]      Teamsters Local 312 v. Matlack, Inc., 118 F.3d 985, 995 (3d Cir. 1997).

[55]      See Reply in Further Supp. of Defs.' Mot. at 4.

[56]      See Mem. of Law in Supp. of Defs.' Mot. to Dismiss at 8-9, 17; see also, Defs.' Consol. Mem. of Points and Auth. in Supp. of Mot. to Vacate, Ex. 5.

than as 10% of CCLLC stock, is not fatal to his claim. The Court agrees with the Arbitrator's

finding that even where Plaintiff did not articulate the claim verbatim, Defendants, by their own

admission, had ample opportunity to assert its position on this issue during the arbitration, even if

only to preemptively articulate that the Arbitrator should not include the issue of the I-Link

shares in its consideration of any award amount granted in Plaintiff's favor. The Court finds that

Defendants could (and in fact did) anticipate that Wasserson would contend that he was entitled

to a portion of the I-Link shares transferred during the April 2001 Webtotel/I-Link merger, and

had adequate opportunity to defend the claim.

<em>(iii) Manifest Disregard of the Law.</em>

Manifest disregard of the law is a judicially created standard, distinct from the statutory

mechanisms under Section 10(a) of the FAA.[57] Defendants argue that the Arbitrator "manifestly

disregarded" New York law and "well-established legal principles" in concluding that,

"notwithstanding the...language in Paragraph 19 of the 2001 Employment Agreement,

[Wasserson] had not relinquished all claims under the 2000 Employment Agreement as well as

any equity in I-Link."[58] The Arbitration record, however, reveals that Defendants intentionally

failed to disclose the exchange of Wasserson's stock in Webtotel for I-Link stock and then

blatantly misrepresented the status of Webtotel to induce Wasserson into signing the 2001

Employment Agreement. After hearing all the testimony and reviewing the relevant evidence

presented at the five-day hearing, the Arbitrator gave full consideration to applicable New York

law when he concluded that Wasserson would not have voluntarily waived his rights by signing

---

[57] See Metromedia Energy, Inc., 409 F.3d at 578-579.

[58] Defs.' Consol. Mem. of Points and Auth. in Supp. of Mot. to Vacate at 12; Reply in Further Supp. of Defs.' Mot. at 7-8.

the 2001 Employment Agreement containing its boilerplate waiver clause, had Defendants disclose this information.[59]

Defendants also assert that the Arbitrator "relied merely on conjecture and guesswork in concluding that Plaintiff would have sold I-Link shares after his termination from the company in December 2003; that he could have sold all such shares at one time; and that the market price would have been $0.19 per share."[60]  This assertion, however, is contrary to the Arbitration record, which reflects that the Arbitrator considered supplemental memoranda, replies, and expert reports from both parties specific to the stock valuation issue.  Upon review of these materials, the Arbitrator concluded that Wasserson adequately proved the amount of his damages by a preponderance of the evidence.[61]  The Arbitrator then, taking into account the parties' expert reports, made a reasonable determination of the appropriate valuation of the stock and the dollar amount of damages due Wasserson.  Although Defendants disagree with the Arbitrator's conclusions, the findings of fact and conclusions of law, as made by the Arbitrator, do not pose a manifest disregard of the law.

### B.    Finding Regarding the Prevailing Party

Defendants argue that "if the Court grants [their Motion] to vacate that portion of the Award regarding [Wasserson]'s entitlement to the I-Link shares, Defendants...request that the

---

[59]    See Whitehead v. Town House Equities, Ltd., 780 N.Y.S.2d 15, 17 (N.Y. App. Div. 2004)(fraud in the execution arises where a party did not know the consequences of signing a document, and was nonetheless misled into doing so).

[60]    Reply in Further Supp. of Defs.' Mot. at 8.

[61]    See Baskin-Robbins Inc. v. S & N Prinja, Inc., 78 F. Supp. 2d 226, 232 (S.D.N.Y. 1999) (Plaintiff in breach of contract action must produce facts and figures from which trier of the facts may make estimate, and mere statement that he estimates his expenses at specified figure, without more, is incompetent).

Court either vacate the Arbitrator's conclusion that [Wasserson] was the 'prevailing party', or alternatively, remand the issue to the Arbitrator."[62]

Essentially, both parties prevailed on some of their claims and defenses, however, there can be only one "prevailing party."[63] A finding by the Arbitrator that Defendants (jointly and severally) intentionally defrauded Wasserson out of 1.7 million shares of stock and failed to pay him salary and benefits owed to him under the Employment Agreements is a sufficient basis to deem Wasserson as the prevailing party. Additionally, Wasserson's award of $360,799.27, plus accrued interest, as compensation for the value of I-Link stock and salary shortfalls, exceeds Counsel Corp.'s award of $296,169.53 (including interest) as compensation for the unpaid loan balance.

The Court finds that Defendants have not demonstrated that the Arbitrator manifestly disregarded the applicable law and have not met their burden of persuasion in favor of vacating the Final Arbitration Award. Considering the statutory mechanisms for vacating an arbitration award, the Court finds that the Arbitrator adequately reviewed pertinent evidence during the hearing, exercised no partiality, and did not exceed his powers.[64]

### C.     Calculation of Final Award

Defendants argue that Wasserson miscalculated the actual dollar amount of the Award in Paragraph 6 of his Motion, "by nearly $13,000 in his favor," based on his (1) "misapplication of 9% interest to the value of the I-Link shares" and (2) "use of 9% rather than the awarded 10%

---

[62]      Defs.' Consol. Mem. of Points and Auth. In Supp. of Mot. to Vacate at 14.

[63]      See Interim Award at 54.

[64]      The latter being the only statutory reason argued by the Defendants for vacatur.

interest in calculating the total that he owes pursuant to the ESPP promissory note."[65]

Defendants offer Ex. 16 to its Motion as the "proper calculation of the Arbitrator's monetary award." Wasserson counters that "Defendants are not entitled to interest at 10% on the amount due from Wasserson under the Executive Stock Loan" because the "amount owed to Wasserson far exceeded the amount owed by Wasserson and "since these are mutual debts among common parties...the Executive Stock loan claim is...setoff at the time of accrual from the larger amount owed to Wasserson."[66]

The Arbitrator computed the following in its Final Award:

1. Respondents, jointly and severally, are liable to Wasserson in the following amounts:

a. the amount of $331,632.27 representing the value of the I-Link stock of which Wasserson was deprived, plus simple interest on that sum at the rate of nine (9%) percent per annum (the New York statutory rate) from December 3, 2003 until the date of payment;

b. the amount of $29,167 representing the underpayment of Wasserson's base salary for the period April 1, 2001 through October 31, 2001, plus simple interest on that sum at the rate of nine (9%) percent per annum from October 31, 2001 to the date of payment);

c. the amount of $75,000 in partial reimbursement of the [Wasserson]'s attorney's fees. This amount will not bear interest;

d. the amount of $67,232.93 representing the cost of arbitration (including the fees of the Arbitrator) that have been paid by [Wasserson]. This amount will not bear interest. This amount includes the sum of $6,241.01 advanced by [Wasserson] on behalf of [Defendants].

2. [Wasserson] is liable to...[Counsel Corp.] in the amount of $191,670 in repayment for his loan plus simple interest on that sum at the rate of ten (10%) percent per annum from February 1, 2004 until the date of payment;

3. This Award is in full settlement of all claims and counterclaims presented for determination in this arbitration.[67]

---

[65] Defs.' Consol. Mem. of Points and Auth. In Supp. of Mot. to Vacate at 14.

[66] Response to Defs.' Consol. Mem. of Points and Auth. in Supp. of Mot. to Vacate at 21-22.

[67] Final Award at 61-62.

The Arbitrator's thorough, sixty-page Award culminated into a complete and concise calculation of damages. Not only are these computations specific and succinct, but had the Arbitrator intended for a setoff to be part of the final Award, he could have easily added it into his calculations, and/or would have likely discussed the idea of setoff elsewhere in the Award narrative. Nowhere in the Award does the Arbitrator mention the term "setoff." The same is true of his 55-page Interim Award.

The Court finds that Wasserson's calculation of damages, presented in its Motion, is inconsistent with the Award articulated by the Arbitrator. Wasserson cannot arbitrarily change the interest rate on his loan balance; he is bound by the rate he contracted to pay. Nor can he calculate amounts for setoff, as the debts between the parties are not mutual and the Award never contemplated a setoff. Therefore, the Court finds no basis to disturb the judgment of the Arbitrator, as Wasserson requests.

## IV. CONCLUSION

The Court finds that the Arbitrator issued a detailed and precise Award, thoroughly addressing each of the claims pending in the two underlying actions, which is hereby affirmed in all regards. The Arbitrator sufficiently established the prevailing party to the Arbitration. Wasserson's calculation of the Award amount in its Motion to Confirm is refused. Accordingly, Plaintiff's Motion to affirm the Award is granted in part, and denied in part, and Defendants' Motion is denied as to their request to vacate or remand the Award.

An appropriate order follows.